**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| **ANIL VELUVOLU and** | * | **CIV. ACTION NO.: 5:18-cv-00197-EEF-** |
| **JENNIFER VELUVOLU** | * | **MLH** |
| | * | |
| **Plaintiffs** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **AMERICAN HONDA MOTOR CO.** | * | |
| **INC.** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

I.      Introduction ..................................................................................4

II.     Argument .....................................................................................6

        A.      The evidence is insufficient to sustain plaintiffs'
                redhibition claim ............................................................6

                1.      "No starts" and battery complaints. ......................9

                2.      Door "rattle." ......................................................12

        B.      Alternatively, the evidence is insufficient to sustain
                plaintiffs' claim to rescind the sale. ...............................14

        C.      In any event, the evidence in insufficient to sustain
                plaintiffs' claim for nonpecuniary damages. ....................16

        D.      The evidence is insufficient to sustain plaintiffs'
                MMWA claim. ...............................................................18

        E.      Plaintiffs' "negligent repair" claim against AHM fails as
                a matter of law and as a matter of undisputed fact. ...........19

III.    Conclusion ...................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Aucoin v. Southern Quality Homes, LLC,*
984 So. 2d 685 (La. 2008) .................................................................................................7, 11

*Bank of Greensburg v. Forrest,*
520 So. 2d 728 (La. 1988) ......................................................................................................20

*Chaudoir v. Porsche Cars of North America,*
667 So. 2d 569 (La. App. 3d Cir. 1995) ...............................................................................18

*Chesapeake La., L.P. v. Innovative Wellsite Systems,*
12-2963 (W.D. La. 11/6/14), 2014 U.S. Dist. LEXIS 157341 .................................................20

*Commercial Union Ins. Co. v. Ryland Dodge & Chrysler, Inc.*
457 So. 2d 255 (La. App. 3d Cir. 1984) .................................................................................8

*Edelman Systems, Inc. v. Capitol GMC, Inc.,*
345 So. 2d 99 (La. App. 1st Cir.), *writ denied,* 347 So. 2d 250 (La. 1977)..................................8

*Family Drug Store, Inc. v. Gulf States Computer Service,*
563 So. 2d 1324 (La. App. 3d Cir. 1990 ................................................................................11

*Fidele v. Crescent Ford Truck Sales, Inc.,*
786 So. 2d 147 (La. App. 5th Cir. 2001) .................................................................................9

*Gradney v. Chandeleur Homes, Inc.,*
900 So. 2d 282 (La. App. 3d. Cir. 2005) .................................................................................7

*Green v. Benson and Gold Chevrolet,*
811 So. 2d 970 (La. App. 5th Cir.), *writ denied,* 817 So. 2d 96 (La. 2002) ...............................9

*Halphen v. Johns-Manville Sales Corp.,*
484 So. 2d 110 (La. 1986) ......................................................................................................19

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.,*
MDL-991 (E.D. La. 8/15/95), 1995 U.S. Dist. LEXIS 12398...................................................18

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.,*
177 F.R.D. 360 (E.D. La. 1997)...............................................................................................19

*Jordan v. Security Co.,*
425 So. 2d 333 (La. App. 3d Cir. 1982) ..............................................................................7, 8

*Malbrough v. City of Rayne,*
10-107 (W.D. La. 3/11/19), 2019 U.S. Dist. LEXIS 38756 ........................................6

*Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc.,*
315 So. 2d 660 (La. 1975) ........................................................................................7, 8

*Napoli v. Guillory,*
509 So. 2d 798 (La. App. 1st Cir.), *writ denied,* 512 So. 2d 1182 (La. 1987)...........14

*Naz v. Philips Healthcare,*
17-12196 (E.D. La. 4/23/18), 2018 U.S. Dist. LEXIS 67773 ...................................20

*Osborne v. Ladner,*
691 So. 2d 1245 (La. App. 1st Cir. 1997)..................................................................16

*Pierre v. Medtronic, Inc.,*
17-12196 (E.D. La. 4/23/18), 2018 U.S. Dist. LEXI 67773 .....................................20

*Peyton v. Charvet's Garden Center,*
427 So. 2d 592 (La. App. 5th Cir. 1983) .....................................................................8

*Riley v. Ford Motor Co.,*
442 F.2d 670 (5th Cir. 1971) .....................................................................................20

*Stroderd v. Yamaha Motor Corp., U.S.A.,*
04-3040 (E.D. La. 8/4/05), 2005 U.S. Dist. LEXIS 17797.................................19, 20

*Young v. Ford Motor Co.,*
595 So. 2d 1123 (La. 1992) ..................................................................................16, 17

**Statutes**

La. Civ. Code art. 2315.6.............................................................................................17

La. Civ. Code art. 2520.............................................................................7, 11, 14, 15

La. Civ. Code art. 2530.............................................................................................11

La. Civ. Code art. 2531 .............................................................................................15

La. Civ. Code art. 2541.............................................................................................15

La. Civ. Code art. 2545.............................................................................................15

La. Rev. Stat. 9:2800.52............................................................................................19

La. Rev. Stat. 9:2800.53...........................................................................................19

**Other**

John Kennedy, *A Primer on the Louisiana Products Liability Act,*
49 La. L. Rev. 565 (1989)........................................................................................19

## I.      Introduction.

Plaintiffs seek to rescind the sale of a 2017 Acura NSX and to recover approximately $300,000.00 for the vehicle's purchase price, expenses, damages, and attorney fees.[1]   On February 26, 2018, they sued American Honda Motor Co., Inc. ("AHM") – the vehicle's distributor and the sole defendant in this case – asserting claims for "violations of the Louisiana redhibition laws," "violation of the Magnuson-Moss Warranty" Act ("MMWA"), and "negligent repair."   *See* plaintiffs' "Amended Complaint" (Doc. 3).   Plaintiffs' lawsuit claims that "the Acura was defective in materials and workmanship," alleging:

> a.      Multiple instances of the engine failing to start and not having power and having to charge a 12 volt battery in order to start the engine;
>
> b.      A "parasitic draw" to cause the vehicle not to start;
>
> c.      The engine will not crank after sitting for a couple of weeks or more;
>
> d.      Battery failing load test and having to be replaced;
>
> e.      A battery tender being added after the sale during repairs, which was not a[n] add-on component that was expected by nor warned about to the plaintiffs and
>
> f.      Rattle in left and right doors at speeds above 25 mph.

(Doc. 3 at paragraph 15).

---

[1]        Exhibit "1" (Plaintiffs' Initial Disclosures).

4

The 2017 Acura NSX is a "Sport Hybrid Super Handling-All Wheel Drive vehicle" that "uses a Twin Motor Unit, Direct Drive Motor, and a gasoline engine as propulsion sources, with electric motors receiving electricity from an internal High Voltage battery."[2]  Plaintiff purchased the vehicle from Orr Acura/Infiniti/Cadillac, a Shreveport dealership that is not a party to this case, for a "cash sale price" of $196,415.00[3] and took delivery of the vehicle on November 16, 2016.[4]  Plaintiff complains that three months and 250 miles later, on February 13, 2017, the vehicle would not start and was towed to Orr for service.[5]  On three subsequent dates – in April 2017, June 2017, and August 2017 – he experienced a similar problem; in April 2017 and again in August 2017, Orr replaced the vehicle's 12-volt battery and on the latter occasion gave him an accessory battery charger kit at no charge to plaintiff.[6]  Plaintiff also complains that on some occasions, the vehicle's door handles have not automatically "deployed" as he approached and that consequently, he had "to manually pull them out to open the door."[7]  Additionally, he complains that around April 2017, he began to hear a "rattle" in one or both of the vehicle's doors when driving at speeds over 25 miles per hour.

The case is set for trial beginning August 19, 2019.  For reasons that follow, and pursuant to the Court's scheduling order (Doc. 12), AHM moves for summary judgment.

---

[2]     Exhibit "2-A" (Owner's Manual) at p. 9.

[3]     Ex. "3" (Buyer's Order).  The "cash sale price" does not include additional taxes, fees, warranty, and finance charges that plaintiff also paid.

[4]     Ex. "4" (deposition of Anil Veluvolu) at p. 10.

[5]     Ex. "4" (deposition of Anil Veluvolu) at pp. 88-90.

[6]     Ex. "4" (deposition of Anil Veluvolu) at pp. 94-107.

[7]     Ex. "4" (deposition of Anil Veluvolu) at pp. 74-75.

II.    **Argument.**

This Court recently reiterated the summary judgment standard:

> "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."
>
> Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  All reasonable factual inferences are drawn in favor of the nonmoving party.  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."  "Conclusory allegations unsupported by specific facts ... will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations ... to get to a jury without any "significant probative evidence tending to support the complaint.""""

*Malbrough v. City of Rayne,* 10-107 (W.D. La. 3/11/19), 2019 U.S. Dist. LEXIS 38756.

AHM is entitled to summary judgment in this case.

A.    **The evidence is insufficient to sustain plaintiffs' redhibition claim.**

Under Louisiana's redhibition laws, liability attaches only for defects that are "redhibitory."  To be "redhibitory," a "defect" must either (a) "render[] the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had

6

he known of the defect"; or (b) "without rendering the thing totally useless, … diminish[] its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price."  La. Civ. Code art. 2520 (West 2019).

Like in any other civil action, a plaintiff in redhibition bears the burden of proof.  He "need not necessarily introduce expert testimony" nor "seek out, allege and prove the underlying cause of the defects which make the thing sold unfit," but "it is still necessary that he prove the existence of a defect at the time of the sale," *Jordan v. Security Co.*, 425 So. 2d 333, 335 (La. App. 3d Cir. 1982),  or – in the case of a redhibition claim against a manufacturer – at the time of the thing's manufacture.  *Aucoin v. Southern Quality Homes, LLC,* 984 So. 2d 685, 693 (La. 2008).  To satisfy that burden, a claimant may rely on circumstantial evidence.  *Gradney v. Chandeleur Homes, Inc.*, 900 So. 2d 282, 285-86 (La. App. 3d. Cir. 2005).  If he does so, however, his evidence must "exclude other reasonable hypotheses with a fair amount of certainty." *Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc.*, 315 So. 2d 660, 662 (La. 1975).  If it does not, then the plaintiff has failed to establish a *prima facie* case in redhibition under Louisiana law.

Thus for example, in *Jordan v. Security Co.*, 425 So. 2d 333 (La. App. 3d Cir. 1982), the court held that a plaintiff's testimony that a shotgun he purchased repeatedly "hung up" was insufficient to establish a *prima facie* case in redhibition.  A plaintiff in redhibition "need not necessarily introduce expert testimony" nor "seek out, allege and prove the underlying cause of the defects which make the thing sold unfit," the court acknowledged, but "it is still necessary that he prove the existence of a defect at the time of the sale." *Id.* at 335.  The plaintiff's proof consisted of "his own testimony and the testimony of his hunting partner," which established that the gun had indeed malfunctioned on more than one occasion.  *Id.*  The defendant, however,

7

provided expert testimony that "explained many ways in which the gun could malfunction in this manner without the gun being defective," including "operator error, short loading, improper maintenance and care, and intentional jamming." *Id.* Notably, the expert testimony did <u>not</u> establish which of those "many ways" more likely than not caused the malfunction, but the court held that "the malfunctioning of the gun, i.e., 'hanging up' in itself does not establish that the gun is defective" and that plaintiff had failed to establish a *prima facie* case in redhibition:

> The testimony of [plaintiff and his hunting companion] merely established that the gun "hung up." Within the factual context of this case, fair inferences may be drawn from such malfunctions other than the gun is defective. For example, the gun becoming "hung up" could have resulted from improper loading. To allow [plaintiff] to establish a prima facie case on such evidence places an undue burden on [the defendant] who has no personal knowledge as to the acts preceding the malfunction.

*Id.*

*Jordan* is no anomaly. Louisiana case law establishes that where within the factual context of a case, a product's malfunctioning allows for "fair inferences" other than that the product is inherently defective, the plaintiff must exclude those other fair inferences with a "fair amount of certainty." *Moreno's, Inc.*, 315 So. 2d at 662. If the plaintiff does not, the defendant is entitled to judgment. *See, e.g., Commercial Union Ins. Co. v. Ryland Dodge & Chrysler, Inc.*, 457 So. 2d 255 (La. App. 3d Cir. 1984) (automobile seller entitled to judgment; evidence showed merely that car burned within days of sale and "inferences other than that the car is defective may be drawn"); *Peyton v. Charvet's Garden Center*, 427 So. 2d 592 (La. App. 5th Cir. 1983) (browning of sod "a few days subsequent" to sale and later discovery of "bug infestation" insufficient to sustain redhibition claim because "bugs could just as easily have migrated from anywhere in the neighborhood"); *Edelman Systems, Inc. v. Capitol GMC, Inc.*, 345 So. 2d 99 (La. App. 1st Cir.), *writ denied*, 347 So. 2d 250 (La. 1977) (repeated truck malfunctions and

8

need for repairs did not establish redhibitory defect where repairs "may have" resulted from, among other things, wear, "improper work performed by third persons" or "improper maintenance"); *Green v. Benson and Gold Chevrolet*, 811 So. 2d 970 (La. App. 5th Cir.), *writ denied*, 817 So. 2d 96 (La. 2002) (affirming involuntary dismissal – "plaintiff proved that she experienced problems with the vehicle which began almost immediately after she purchased it," but her witnesses did not know cause of problems and no "expert testimony or evidence at trial [established] that a defect existed in the vehicle or that the repairs were necessitated by any defect"); *Fidele v. Crescent Ford Truck Sales, Inc.*, 786 So. 2d 147 (La. App. 5th Cir. 2001) (affirming involuntary dismissal where evidence described a host of problems beginning "shortly after" purchase of vehicle, because "[t]here are some hypotheses which are suggested which are reasonable and that is that [plaintiff's] lack of maintenance of this vehicle could have caused the problems").

In this case, AHM is entitled to summary judgment dismissing plaintiffs' redhibition claim because, as a matter of law, the evidence is insufficient to show that the vehicle issues of which plaintiffs complain are attributable to "defects" at all, let alone defects resulting from the original manufacture of the product.

### 1.      "No starts" and battery complaints.

The 2017 Acura NSX is, as plaintiff recognizes, a "hybrid electric supercar," one that he wanted "because of its technology."[8]  It came, of course, with a detailed owner's manual, which plaintiff conceded he had not read:  "Not front to back, no, sir."[9]  Among the vehicle's features

---

[8]       Ex. "4" (deposition of Anil Veluvolu) at p. 17.

[9]       Ex. "4" (deposition of Anil Veluvolu) at p. 122.

about which plaintiff confessed himself "ignorant"[10] is the presence of both "a standard 12-volt battery that powers the airbags, the interior and exterior lights, and other standard 12-volt systems; and a High Voltage battery that is used to power the propulsion motors and recharge the 12-volt battery."[11]

Plaintiff testified that "to [his] knowledge," his hybrid electric vehicle "has giant batteries that have patent pendings on this technology, and it … was supposed to be able to sit for three months without activity and still maintain battery charge."[12]   Although he originally suggested that his understanding was based on the "[o]wner's manual," he later corrected himself:   "I'm sorry, the service department [at Orr, a non-party to this case] told me that….  Well, they told me it was in the owner's manual…. I didn't check to see if they were…."[13]   In reality, the owner's manual explains many things about the vehicle's 12-volt battery and its need for maintenance and charging, but it certainly does not suggest that the 12-volt battery can "sit for three months without activity and still maintain battery charge":

- The 12-volt battery condition is to be checked monthly;[14]

- The 12-volt battery can drain and/or go "dead, in which case the vehicle's "power system won't start" until the 12-volt battery is "jump start[ed] using a booster battery";[15]

- The 12-volt battery charges "when the power system is on";[16]

---

[10]    Ex. "4" (deposition of Anil Veluvolu) at p. 77.

[11]    Ex. "2-A" (Owner's Manual) at p. 12.

[12]    Ex. "4" (deposition of Anil Veluvolu) at pp. 76-77.

[13]    Ex. "4" (deposition of Anil Veluvolu) at p. 122.

[14]    Ex. "2-A" (Owner's Manual) at pp. 27, 403.

[15]    Ex. "2-A" (Owner's Manual) at pp. 28, 123, 128, 131, 137, 154, 155, 164, 309, 434.

- The 12-volt battery is one of the "maintenance items under the hood and latch";[17]

- During periods of vehicle non-use, "[t]o maintain the low-voltage 12-volt battery, connect it to an accessory battery charger.  For more information on how to maintain your 12-volt battery, consult an authorized Acura NSX dealer."[18]

Simply false, then, is plaintiffs' allegation that a "battery tender being added after the sale during repairs" constitutes or evidences a defect in the vehicle (Doc. 3 at paragraph 15), for the owner's manual specifically contemplates and recommends the use of an "accessory battery charger" to "maintain the low-voltage 12-volt battery."[19]  *See, Family Drug Store, Inc. v. Gulf States Computer Service,* 563 So. 2d 1324, 1326-27 (La. App. 3d Cir. 1990) (buyer dissatisfaction cannot establish defect where product operates as intended).  Indeed as a matter of law, the evidence is insufficient to suggest that *any* of the battery/"no start" issues of which plaintiffs complains is attributable to a "defect" within the meaning of Civil Code article 2520 that "'resulted from the original manufacture' of the product."  *Aucoin*, 984 So. 2d at 693.

The battery/"no start" issues that plaintiffs allege cannot be presumed attributable to any "defects that exist[ed] at the time of delivery" or manufacture, because they did not manifest until at least three months after the sale.  La. Civ. Code art. 2530 (West 2019) ("The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time.")  Plaintiff's testimony establishes no 12-volt battery maintenance and confirms that he has "never" used an accessory battery charger as recommended by his owner's manual.[20]

---

[16]    Ex. "2-A" (Owner's Manual) at p. 75.

[17]    Ex. "2-A" (Owner's Manual) at p. 371.

[18]    Ex. "2-A" (Owner's Manual) at p. 414.

[19]    Ex. "2-A" (Owner's Manual) at p. 414.

[20]    Ex. "4" (deposition of Anil Veluvolu) at pp. 61, 76.

11

Furthermore, plaintiffs have disclosed no timely expert witnesses and have produced no timely expert reports.[21]

Plaintiffs therefore have no competent evidence to establish that their battery/"no start" complaints constitute or evidence redhibitory defects.  On the contrary, plaintiffs concede that after the first "no start" incident in February 2017, Orr technicians advised them to store the vehicle's keys farther away from the vehicle itself "because we did not want it too close to the vehicle to, by chance, run the power on it because it senses that key fob."[22]  The other incidents, particularly those in June 2017 and August 2017, occurred after periods of vehicle non-use with no battery charger utilized:  plaintiff testified that the June 2017 "no start" incident happened after the vehicle had been sitting "a few weeks" in his mother's garage, and that after the August 2017 "no start" incident, Orr "asked me when the car was driven before that time, and I just told them it's been a few weeks."[23]

### 2.      Door "rattle."

Plaintiffs' lawsuit also alleges that the vehicle is defective because of a "[r]attle in left and right doors at speeds above 25 mph" (Doc. 3 at paragraph 15).  While this alleged "defect" may or may not actually exist as plaintiff describes it,[24] plaintiffs have no competent evidence to

---

[21]      The plaintiffs' deadline for producing any expert reports was February 5, 2019 (Doc. 14).

[22]      Ex. "5" (deposition of Jennifer Veluvolu) at p. 21.  Anil Veluvolu confirmed that "[t]hey [Orr] told us to do that … after that first time…. "[A]fter the first time it … didn't start, they told us that – that may be an issue, so we moved it.  And we didn't keep it in that drawer anymore, it went back into my master bedroom, my closet and it was kept away."  *Id.* at pp. 22-24.  *See also,* Ex. "2-A" (Owner's Manual) at p. 414 ("For more information on how to maintain your 12-volt battery, consult an authorized Acura NSX dealer").

[23]      Ex. "4" (deposition of Anil Veluvolu) at p. 100.

[24]      AHM's expert, James Jongkind, observed that when he drove the vehicle, he detected a "faint rattle noise" that "occurred only when driving on rough surfaces below 25 mph."  *See* Ex. "2-B" (report of AHM expert James Jongkind).

attribute the condition to a redhibitory defect that existed at the time of the vehicle's manufacture.  Plaintiff's deposition testimony shows that the alleged "rattle" did not develop until six months after the date of the vehicle's delivery,[25] and the evidence shows that Orr attributed the condition to loose door handle set screws on the left door and on the right, the door handle cable tapping on the inner part of the door.[26]  No competent evidence establishes or even suggests that the conditions existed at the time of the vehicle's manufacture; certainly no expert testimony suggests the existence of a manufacturing or design defect of any kind.

For all these reasons, plaintiffs' evidence is insufficient as a matter of law to establish that his 2017 Acura NSX is redhibitorily defective.  On the other hand, AHM's expert, James Jongkind, has inspected, tested, and driven the vehicle, and concludes among other things that: (a) no stored diagnostic trouble codes suggest that a malfunction has occurred in any of the vehicle's electronic control systems; (b) the automatic pop-out door handles deploy normally and as described in the owner's manual; (c) the vehicle drives and performs normally; (d) there is no abnormal electric current consumption with the vehicle; (e) the infotainment touch screen operates normally and without any problem;[27] (f) the vehicle is free from any defects in material or factory workmanship, and (g) the vehicle is fit for its ordinary purpose and is a safe and reliable means of transportation.[28]  With no expert testimony to refute that of AHM's, no competent evidence to establish or even suggest that the issues of which plaintiffs complain are attributable to redhibitory defects, and no available legal presumption that the issues are

---

[25]     Exhibit "4" (deposition of Anil Veluvolu) at p. 95.

[26]     Ex. "2-B" (report of AHM expert James Jongkind).

[27]     In his deposition, plaintiff suggested that the vehicle's "infotainment system touch screen" had for the first time been briefly nonresponsive the day before his deposition, over two years after he took delivery of the vehicle.  Ex. "4" (deposition of Anil Veluvolu) at p. 66.

[28]     Ex. "2-B" (report of AHM expert James Jongkind).

attributable to redhibitory defects, plaintiffs' redhibition claim fails as a matter of law. Accordingly, AHM is entitled to and requests judgment dismissing plaintiffs' redhibition claim with prejudice.

**B.    Alternatively, the evidence is insufficient to sustain plaintiffs' claim to rescind the sale.**

Alternatively, AHM is entitled to judgment dismissing plaintiffs' claim under Civil Code article 2545 for rescission of the sale, a refund of the purchase price with interest, costs associated with the sale and the vehicle's preservation, and damages.  Even if the plaintiffs' evidence was sufficient to establish the existence of any redhibitory defects at all, and it is not, rescission of the sale and recovery under article 2545 is appropriate only in cases where the evidence establishes that a redhibitory defect "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect."  La. Civ. Code art. 2520 (West 2019).

> The test to determine whether a vice or defect is sufficient to set aside a sale is clearly expressed by article 2520.  The "vice or defect" must render the thing either (1) absolutely useless, or (2) so inconvenient and imperfect, that under either situation, it must be supposed a "buyer would not have purchased it, had he known of the vice."
>
> The test to be applied is one of reasonableness or "reasonable man."  It is of no moment that the plaintiff buyer who files suit to rescind a sale testifies that he would not have purchased the thing if he would have known of the vice.  Obviously, if a buyer files suit to rescind the sale, he would not have purchased the thing had he known of the vice.  The test is not what a plaintiff-buyer would have done, but what a "reasonable man" would have done under like circumstances.

*Napoli v. Guillory,* 509 So. 2d 798, 799 (La. App. 1st Cir.), *writ denied,* 512 So. 2d 1182 (La. 1987).   Even where evidence establishes a redhibitory defect, the Civil Code article expressly

authorizes the Court to "limit the remedy of the buyer to a reduction of the price."  La. Civ. Code art. 2541 (West 2019).

The Civil Code articles regarding rescission provide for recovery not only of the thing's purchase price, but also for recovery of "interest from the time it was paid," "reasonable expenses occasioned by the sale, as well as those incurred for preservation of the thing," and "also for damages."  La. Civ. Code art. 2531, 2545 (West 2019).  The Civil Code articles regarding reduction of price, however, reference only "reduction of the price"; unlike the rescission articles, the "reduction of price" articles include no express provisions for recovery of "damages" or even "expenses."  La. Civ. Code art. 2520, 2541 (West 2019).  Moreover, the Civil Code clearly contemplate that a "reduction of price" will be a lesser remedy than that accompanying a rescission, for the articles reference a "reduction of price" as a limitation on recovery:  "The existence of such a defect limits the right of the buyer...."  *Id.*

Here, even if the plaintiffs' evidence was sufficient to establish that the issues of which they complain are attributable to redhibitory defects that existed in the vehicle at the time of its manufacture (and it is not), the evidence so overwhelmingly establishes that this is not an appropriate case for rescission that reasonable minds could not differ.  Plaintiffs concede that of the "defects" alleged in the lawsuit, the battery/"no start" issues, are no longer present.[29]  They have produced no competent evidence, expert or otherwise, to suggest that these alleged

---

[29]    Ex. "4" (deposition of Anil Veluvolu) at pp. 74-75.  In his deposition, plaintiff suggested that a "variation" of what his lawsuit describes as a "parasitic draw" on the 12-volt battery exists in the vehicle currently:  "When you have the key in your pocket, the door handles are supposed to deploy when you walk up to the car, so that does not happen sometimes when the car is sitting.  I have to manually pull them out to open the door.  That is still happening."  *Id.*  Plaintiffs offer no competent evidence to link this alleged condition to the battery/"no start" issues of which they complain, but in any event, the operator's manual belies the suggestion that what plaintiff is describing constitutes a defect.  The manual explains that in various situations, the "auto pop-out function" is *intended* to be disabled, for example, "If you lock the doors and then keep the keyless remote within the detection range for more than 2 minutes"; "If you walk away from the vehicle when the power system is on"; and notably, "'If the vehicle is left for more than 8 days."  *See* Ex. "2-A" (Owner's Manual) at pp. 108-109.  In any event, the "auto pop-out function" was operating properly on the day of plaintiffs' depositions.  *See* Ex. "2-B" (report of AHM expert James Jongkind).

"defects" still exist in the vehicle.  And to the extent that the door "rattle" – of which plaintiff did not complain until six months after the sale and which he contends manifests "at speeds above 25 mph" – exists,[30] his own testimony establishes that the condition does not merit rescission.  For one thing, he testified that he's chosen "to let that one go" rather than request repair, and in any event, to the extent that he claims that the vehicle "does not operate right," he is not referring to the alleged "rattle."[31]  Because the evidence fails as a matter of law to establish that the alleged "defects" of which plaintiffs complain are ones that rendered the vehicle absolutely useless, or so inconvenient and imperfect that it must be supposed a "buyer would not have purchased it, had he known of the vice," AHM is entitled to and requests judgment dismissing plaintiffs' claim for a rescission of the sale and limiting plaintiffs' recovery, if any, to a reduction of purchase price: "the difference between the actual sales price and the price a reasonable buyer and seller would have agreed upon, if they had known of the defect."  *Osborne v. Ladner,* 691 So. 2d 1245, 1258 (La. App. 1st Cir. 1997).

**C.     In any event, the evidence is insufficient to sustain plaintiffs' claim for nonpecuniary damages.**

The Louisiana Supreme Court has held that non-pecuniary damages are recoverable in redhibition only where the object of the sale was the satisfaction of a nonpecuniary interest and the seller has reason to know of that.  *Young v. Ford Motor Co., Inc.*, 595 So. 2d 1123 (La. 1992).  In *Young,* the Louisiana Supreme Court declared that recovery of non-pecuniary damages requires that a significant objective in the purchase be the gratification of a non-pecuniary interest.  The *Young* court noted that the purchase of truck or car might be prompted by both

---

[30]     Ex. "4" (deposition of Anil Veluvolu) at pp. 78, 95.

[31]     Ex. "4" (deposition of Anil Veluvolu) at pp. 78-81.  AHM's expert James Jongkind's report describes what Orr did to address plaintiff's "rattle" complaint.  *See* Ex. "2-B" (report of AHM expert James Jongkind),

pecuniary and non-pecuniary interests but held that in the absence of particular factors demonstrating otherwise, the nature of such a contract is deemed to be primarily pecuniary. *Id.* at 1133.

In this case, both the plaintiffs assert independent claims for "general damages, mental anguish, humiliation and inconvenience."[32]   As a matter of law, the evidence is insufficient to sustain Jennifer Veluvolu's claim.  She conceded from the outset of her deposition that "I am not a car person, so I wasn't as excited about it has he was."[33]  She never intended to drive it, and she never has:  "No, I just like the comfort of my car.  I don't like switching out cars.  And I just want to know what I'm driving.  And I like the consistency of the same car.  Not really."[34]  Indeed, she testified that she "is just not interested in it.  It is the bells and whistles of it.  I just don't even want to – really not interested in driving it to be honest."[35]  Her testimony establishes that the nonpecuniary damages she seeks on her own part arise not from any of her own experiences with the vehicle, but rather as a result of witnessing what she describes as her husband's disappointment.[36]   Louisiana law does not permit such "bystander recovery" absent evidence to establish that the claimant's alleged "mental anguish or emotional distress" is "severe, debilitating, and foreseeable."  La. Civ. Code art. 2315.6 (West 2019).  Ms. Veluvolu's alleged damages fail to meet this standard as a matter of law.  She concedes, for example, that

---

[32]      Exhibit "1" (Plaintiffs' Initial Disclosures).

[33]      Exhibit "5" (Jennifer Veluvolu deposition) at p. 6.

[34]      Exhibit "5" (Jennifer Veluvolu deposition) at p. 10.

[35]      Exhibit "5" (Jennifer Veluvolu deposition) at p. 13.

[36]      Exhibit "5" (Jennifer Veluvolu deposition) at p. 14.

she has not experienced any physical manifestations of her alleged anguish, nor has she sought treatment of any kind as a result.[37]

Under the particular circumstances of this case. summary judgment would also be appropriate to dismiss Mr. Veluvolu's nonpecuniary damages claims.  AHM acknowledges *Chaudoir v. Porsche Cars of North America*, 667 So. 2d 569, 577-78 (La. App. 3d Cir. 1995), in which the court affirmed an award of nonpecuniary damages in a case involving the rescission of a  "'hand built,' top of the line performance car."  In this case, however, unlike the *Chaudoir* plaintiff, Mr. Veluvolu owns not just one such car; rather, he testified that he is a frequent purchaser and owner of high-end vehicles, that he considers them "investments," and that his "primary use" for the vehicle is "to drive my son to school…. So you use it for commuting more or less?  Yes."[38]

## D.    The evidence is insufficient to sustain plaintiffs' MMWA claim.

For the same reasons that entitle AHM to judgment dismissing plaintiffs' redhibition claim, AHM is also entitled to judgment dismissing plaintiffs' Magnuson-Moss Warranty Act ("MMWA") claim.

Courts in Louisiana have recognized that "[a]lthough the Magnuson-Moss Act provides a basis for federal jurisdiction under certain circumstances, plaintiffs' substantive claims under the Act are merely derivative of plaintiffs' state law express and implied warranty claims."  *See, e.g., In re Ford Motor Co. Bronco II Prod. Liab. Litig.,* 177 F.R.D. 360, 364 (E.D. La. 1997).  Thus, where a plaintiff's state law express and implied warranty claims (in this case, plaintiffs' redhibition claims) are dismissed, that plaintiff's MMWA claims should be dismissed as well.

---

[37]        Exhibit "5" (Jennifer Veluvolu deposition) at p. 15.

[38]        Exhibit "4" (Anil Veluvolu deposition) at pp. 18-19, 50-61, 36-37.

*See, e.g., In re Ford Motor Co. Bronco II Prod. Liab. Litig.,* MDL-991 (E.D. La. 8/15/95), 1995

U.S. Dist. 12398, *12.

**E.    Plaintiffs' "negligent repair" claim against AHM fails as a matter of law and as a matter of undisputed fact.**

AHM also requests summary judgment dismissing plaintiffs' "negligent repair" claim

against AHM.  As a matter of law as well as a matter of undisputed fact, AHM cannot be liable

to plaintiffs for the "negligent repair" alleged in plaintiffs' lawsuit.

As a legal matter, Louisiana law does not permit the plaintiffs to  maintain a "negligent

repair" claim against AHM.  As the court explained in *Stroderd v. Yamaha Motor Corp., U.S.A.,*

04-3040 (E.D. La. 8/4/05), 2005 U.S. Dist. LEXIS 17797, *5 (footnotes omitted),

> The LPLA [Louisiana Products Liability Act] "establishes the exclusive theories of liability for manufacturers for damage caused by their products."  La. Rev. Stat. Ann. § 9:2800.52.  "Damage" is defined as "damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that [a redhibition cause of action] does not allow recovery for such damage or economic loss."  La. Rev. Stat. Ann. 9:2800.53(5).  A "manufacturer" is defined as a "person or entity who is in the business of manufacturing a product for placement into trade or commerce."  La. Rev. Stat. Ann. § 9:2800.53(1).
>
> The drafters of the LPLA sought to strictly delimit possible bases of liability for manufacturers.  Consideration and passage of the Act came on the heels of the Louisiana Supreme Court's 1986 decision in *Halphen v. Johns-Manville Sales Corp.,* 484 So. 2d 110 (La. 1986), which expanded manufacturer liability to include strict liability for injuries caused by "unreasonably dangerous per se" products.  *See* John Kennedy, *A Primer on the Louisiana Products Liability Act,* 49 La. L. Rev. 565, 587 (1989) (hereinafter "Kennedy").  The LPLA therefore set out four distinct and exclusive theories of liability.  The sole exception to the exclusivity provisions under the LPLA is redhibition, which the Act expressly preserved.  *See* Kennedy at 580.
>
> The plain language and legislative history of the LPLA demonstrate the legislature's intent to make the Act and Louisiana

redhibition law the sold vehicles for a suit against a manufacturer
for damages arising from a defective product….

The *Stroderd* court therefore dismissed a "negligent repair" claim against the defendant manufacturer, because the claim was not one for redhibition, nor was it one permitted by the LPLA. *Id.* at *17. Other courts, including this Court, have generally followed the rationale of *Stroderd.   See, e.g., Chesapeake La., L.P. v. Innovative Wellsite Systems,* 12-2963 (W.D. La. 11/6/14), 2014 U.S. Dist. LEXIS 157341; *Naz v. Philips Healthcare,* 17-2882 (E.D. La. 11/8/18), 2018 U.S. Dist. LEXIS 191266; *Pierre v. Medtronic, Inc.,* 17-12196 (E.D. La. 4/23/18), 2018 U.S. Dist. LEXIS 67773.  Accordingly, as a matter of law, plaintiffs' "negligent repair" claim against AHM must be dismissed.

Even if plaintiffs' "negligent repair" claim against AHM was legally viable, and it is not, the plaintiffs' evidence is insufficient as a matter of law to sustain it.  Plaintiffs do not allege that AHM itself performed any repairs to the vehicle; instead, they alleged that AHM is liable for alleged negligent repairs on the part of Orr, a non-party (Doc. 3 at paragraphs 38-43).  But as the United States Fifth Circuit Court of Appeals recognized in *Riley v. Ford Motor Co.,* 442 F.2d 670, 672 (5th Cir. 1971), such a claim, even if legally cognizable, "depends on a showing that the dealer was, in fact, an agent of the manufacturer."  Under Louisiana law, "[t]he party seeking to prove that an agency relationship exists has the burden of proof."   *Bank of Greensburg v. Forrest,* 520 So. 2d 728, 732 (La. 1988).  As a matter of law, the plaintiffs in this case have simply not produced evidence sufficient to establish or suggest such an agency.

For these reasons, AHM is entitled to judgment dismissing plaintiffs' "negligent repair" claim against AHM with prejudice.

III.   **Conclusion.**

AHM therefore requests that the Court grant this motion and:

(1)   (A) Enter judgment entirely dismissing plaintiffs' redhibition claims (both for rescission of the sale and reduction in price) against AHM with prejudice and at plaintiffs' cost, or alternatively, (B) enter judgment dismissing plaintiffs' claims for a rescission of the sale of the subject vehicle and relegating plaintiffs' redhibition claim to one for a reduction of the vehicle's purchase price;

(2)   Enter judgment dismissing one or both of plaintiffs' general damage claims;

(3)   Enter judgment dismissing plaintiffs' Magnuson-Moss Warranty Act claim against AHM, with prejudice and at plaintiffs' cost; and

(4)   Enter judgment dismissing plaintiffs' "negligent repair" claim against AHM, with prejudice and at plaintiffs' cost.

Respectfully submitted,

*/s/Charles S. Smith*
MARK N. BODIN (BAR NO. 18803)
CHARLES S. SMITH (BAR NO. 33650)
*McGlinchey Stafford, PLLC*
601 Poydras Street, 12th Floor
New Orleans, Louisiana 70130
Telephone (504) 586-1200
Facsimile: (504) 910-9524
**ATTORNEYS FOR AMERICAN HONDA MOTOR CO., INC.**

## CERTIFICATE OF SERVICE

In accordance with the Western District of Louisiana's electronic filing procedures, I hereby certify that, on this Wednesday, March 20, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. A Notice of Electronic Filing will be sent by the Court to all counsel of record who have consented to email notification and electronic service. This document is available for viewing and downloading from the Court's ECF system.

*/s/Charles S. Smith*
CHARLES S. SMITH
