## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| ANIL VELUVOLU, ET AL. | CIVIL ACTION NO: 18-CV-00197 |
| VERSUS | JUDGE ELIZABETH FOOTE |
| NISSAN NORTH AMERICA INC., ET AL. | MAGISTRATE JUDGE HORNSBY |

### MEMORANDUM RULING

Now pending before the Court is Defendant American Honda Motor Co., Inc.'s ("AHM") Motion for Summary Judgment. [Record Document 17]. Plaintiffs Dr. Anil ("Dr. Veluvolu") and Jennifer Velovolu (together, "Plaintiffs") have filed an opposition [Record Document 21] and AHM has filed a reply [Record Document 24]. For the reasons discussed below, the motion for summary judgment is hereby **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs are ordered to submit additional briefing regarding their negligent repair claim by **Thursday, June 13, 2019**. Summary judgment is **GRANTED** as to Jennifer Veluvolu's claim for nonpecuniary damages pursuant to Louisiana Civil Code article 1998. Summary judgment is **DENIED** as to all other claims.

### I.    FACTUAL BACKGROUND

This matter arises out of the sale of a new vehicle, a 2017 Acura NSX ("the Acura"). Record Document 3, ¶ 8. Plaintiffs purchased the Acura from Orr Infiniti ("Orr") in Shreveport, Louisiana on November 3, 2016. *Id.* Plaintiffs paid a total of $237,199.80 for the vehicle, including finance charges and expenses surrounding the sale. *Id.* at ¶ 9. Plaintiffs assert that AHM is the

manufacturer[1] and warrantor of the Acura.[2] *Id.* at ¶ 2. According to Plaintiffs, the sale of the Acura created an implied warranty of merchantability and an implied warranty under Louisiana's redhibition laws that the Acura was "fit for the ordinary purpose for which such motor vehicles are purchased." *Id.* at ¶ 10. Plaintiffs also claim that, subsequent to the sale, Defendant "impliedly warranted" that repair work on the Acura had been performed in a good and workmanlike manner. *Id.* at ¶ 11. They assert that the Acura was sold with certain express warranties stating that any malfunction of the Acura resulting from defects in material or workmanship would be repaired and necessary parts replaced free of charge during the specified warranty period. *Id.* at ¶s 12–14.

Plaintiffs claim that the Acura began to manifest several defective conditions within a few months after the sale. *Id.* at ¶ 15. They state that those defective conditions include, but are not limited to, multiple instances in which the engine failed to start and the 12-volt battery had to be charged in order to start the engine, the engine's failure to start after sitting for a couple of weeks or more, the battery having to be replaced, and a rattle in the left and right doors at speeds over 25 miles per hour. *Id.*

The Acura was returned to Orr, an authorized warranty service dealer, for repairs numerous times. *Id.* at ¶ 16. Plaintiffs assert that the "more significant and dangerous conditions" of the

---

[1] In its Answer, AHM denies being the manufacturer of the Acura but admits to being its warrantor. Record Document 6, ¶ 2. However, in its motion for summary judgment, AHM does not argue that it is not the manufacturer of the Acura. In fact, in several sections of its brief, AHM appears to concede that it is the manufacturer of the Acura. *See* Record Document 21, p. 20 (arguing that a negligent repair claim cannot be brought against a manufacturer in Louisiana). The distinction between a seller and a manufacturer is important to a redhibitory action because it affects the damages that a plaintiff can recover. *See* La. Civ. Code Ann. arts. 2531 & 2545. The resolution of the instant motion as to the redhibition claims does not turn on AHM's status as a manufacturer. However, AHM is instructed below to submit additional briefing on this issue. *Infra*, p. 21.

[2] Plaintiffs' original complaint [Record Document 1] mistakenly named Nissan North America, Inc., as a defendant. Ten days later, Plaintiffs amended their complaint and named AHM as the only defendant in this action. *See* Record Document 3.

Acura were not repaired on these occasions. Plaintiffs allege that "Defendant" failed to repair the vehicle so as to bring it into conformity with the warranties, despite having a prolonged period in which to do so. *Id.* However, Plaintiffs do not acknowledge that Orr, who they claim performed these repairs, is not a defendant in this case.

Plaintiffs took delivery of the Acura on November 16, 2016. Record Document 17-6, p. 4. On February 13, 2017, the Acura had to be towed to Orr for service because it would not start. *Id.* at 23. The car had 250 miles on it at that time. *Id.* Orr kept the car for two weeks, during which it ran diagnostic tests and consulted with Acura technicians. *Id.* at 24. Dr. Vevuvolu[3] stated that he either does not know or does not remember what was done to repair the Acura during this visit. *Id.*

The Acura was returned to Orr on April 24, 2017, because it would not start, did not have electrical power, and required the car's 12-volt battery to be charged before the engine would start. *Id.* at 25. A technician from Orr drove to Plaintiffs' home, jumped the battery, and drove the Acura to the dealership. *Id.* At this point the car had 827 miles on it. *Id.* Orr replaced the Acura's battery after it failed a load test, and the car was returned to Plaintiffs. *Id.* On this visit, Dr. Veluvolu also complained of a rattle in the left door while driving. *Id.*

The Acura again failed to start in June of 2017. *Id.* at 18. At Dr. Veluvolu's request, Trey Pierce ("Pierce"), Orr's Service Advisor, came out and jumped the battery. *Id.* Dr. Veluvolu then drove the car to work. *Id.* The Acura was not taken to Orr for repairs on this occasion. *Id.*

The Acura was brought to Orr again for repairs on August 23, 2017, because it would not start. *Id.* at 26. The mileage was listed as 1,568 miles. *Id.* The Acura was not returned to Plaintiffs until September 21, 2017. *Id.* Orr tested the 12-volt battery, found it to have a bad cell, and replaced

---

[3] Plaintiffs are both record owners of the vehicle, but the evidence shows that Anil Veluvolu was the one who wanted to purchase the Acura, the one who drove it, and the one who primarily handled dealing with the repairs. *See* Record Document 17-6, p. 4.

it. Record Document 21-3, p. 81. Orr also tested the charging system tested for a "parasitic draw."[4] *Id.* The results of those tests indicated that the Acura and its 12-volt battery were operating normally. *Id.* Orr provided Dr. Veluvolu with an accessory battery charger and recommended that he use it whenever the Acura would be left unused for more than seven days. *Id.*

On November 13, 2017, Dr. Veluvolu brought the Acura to Orr because he was hearing a rattle in both doors. Record Document 17-6, p. 28. Technicians at Orr attempted to resolve the rattle by installing insulation in the doors, but Dr. Veluvolu claims that he could still hear the rattle when he drove home. *Id.* at 29. Dr. Veluvolu brought the Acura to Orr on April 16, 2018, to address the rattle issue again. *Id.* He does not recall hearing the rattle when he picked up the car after this visit, but claims that it has since returned. *Id.* at 30. Plaintiffs did not pay Orr for any of these repairs because the Acura was still under warranty. *Id.* at 30. Plaintiffs contend that the defects in the Acura have substantially impaired its use, value, and safety. Record Document 3, ¶ 17. Plaintiffs also state that they notified AHM and Orr that they wanted to rescind the sale of the Acura but were refused. *Id.* at ¶ 18. Plaintiffs then filed the instant lawsuit against AHM requesting a rescission of the sale, a return of the purchase price and costs related to the sale, damages for mental anguish, humiliation, and inconvenience, and attorney's fees. *Id.* at p. 3.

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine

---

[4] Plaintiffs do not explicitly define what a "parasitic draw" is, but this phrase appears to refer to something that is draining the 12-volt battery and causing it to die more quickly than it normally would. *See* Record Document 21-3, pp. 29–30.

issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. *See id.* at 322–23. However, "if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the nonmovant must demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings" and "designat[ing] specific facts" for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with some metaphysical doubt as to the material facts," by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence." *Id.* (internal quotation marks and citations omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so "weak or tenuous" that it could not support a judgment in the nonmovant's favor. *Armstrong v. City of Dall.*, 997 F.2d 62, 67 (5th Cir. 1993).

Additionally, Local Rule 56.1 requires the movant to file a statement of material facts as to which it "contends there is no genuine issue to be tried." The opposing party must then set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be

tried." W.D. La. R. 56.2. All material facts set forth in the movant's statement "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." *Id.*

## III.  LAW AND ANALYSIS

As this case is before the Court under diversity jurisdiction,[5] the Court must apply the substantive law of the forum state. *Bradley v. Allstate Ins. Co.,* 620 F.3d 509, 517 n.2 (5th Cir. 2010) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64 (1938)). The Fifth Circuit in *In re Katrina Canal Breaches Litigation* stated the appropriate methodology for a federal court sitting in diversity in Louisiana to apply:

> To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court. In the absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case. In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante,* is a secondary law source in Louisiana. Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them.

495 F.3d 191, 206 (5th Cir. 2007) (citations and internal quotation marks omitted).

Plaintiffs allege a cause of action against AHM for breach of warranty against redhibitory defects, pursuant to Louisiana Civil Code article 2520. Plaintiffs also claim that AHM should be held liable for violating the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301–2312, and for making negligent repairs to the Acura. *See* Record Document 3.

---

[5] In their complaint, Plaintiffs assert that the Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Record Document 3, p. 2. The Court could also assert federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs have made a claim under the Magnuson-Moss Warranty Act, which is a federal statute. The Court then would have supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

## A.    <u>Right of Redhibition</u>

Louisiana Civil Code article 2520 states that a seller warrants the buyer against redhibitory defects in the thing sold, and a defect is considered redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. La. Civ. Code Ann. art. 2520. The existence of such a defect entitles the buyer to obtain rescission of the sale. *Id.* The warranty against redhibitory defects applies only to defects that existed at the time of delivery. La. Civ. Code Ann. art. 2530. The buyer must notify the seller of any redhibitory defect in the thing sold and allow the seller an opportunity to make the required repairs. La. Civ. Code Ann. art. 2522. This notice is not required if the seller has actual knowledge of the existence of a redhibitory defect. *Id.*

In order to establish a prima facie case of redhibitory defect, the buyer has the burden of proving by a preponderance of the evidence that a redhibitory defect existed at the time of the sale. *Morris v. United Servs. Auto. Ass'n*, 32,528 (La. App. 2 Cir. 2/18/00); 756 So. 2d 549, 561. "Proof of a redhibitory defect may be by direct or circumstantial evidence which gives rise to a reasonable inference that the defect existed." *Id.* (citations omitted). "The evidentiary burden is that the proof must be more probable than not. The buyer need not prove the underlying cause of the defect, only that it existed." *Id.* "If the circumstantial evidence excludes other reasonable hypotheses with a fair amount of certainty, [the plaintiff] has borne his burden of proof." *Custom Metal & Air Conditioning Co. v. Boudreaux*, 346 So. 2d 1379, 1380 (La. App. 3 Cir. 1977). Finally, the existence of a redhibitory defect is a question of fact to be decided by the trial judge and jury and should not to be disturbed by the appellate court absent manifest error. *Reid v. Leson Chevrolet Co., Inc.*, 542 So. 2d 673, 675 (La. App. 5 Cir. 1989).

A redhibitory defect is presumed to have existed at the time of delivery if it appears within three days from the time of sale. La. Civ. Code Ann. art 2530. The Fifth Circuit has noted that Louisiana courts have held that "even if the defect appears more than three days after the sale, a reasonable inference may arise, in the absence of an intervening cause or other explanation, that the defect existed at the time of sale." *Sweeny v. Vindale Corp.*, 574 F.2d 1296, 1300 (5th Cir. 1978) (citations omitted).

        1.      <u>Existence of a Redhibitory Defect in the Acura</u>

Plaintiffs allege (1) that the defects described in the Acura meet the definition of a redhibitory defect under Louisiana law; (2) that those defects existed at the time of sale, but were not discovered until after delivery; (3) that the Acura is not useable, or its use is so inconvenient that neither Plaintiffs nor a reasonably prudent buyer would have purchased it if they knew of the defects; (4) that they have provided AHM sufficient opportunity to repair the Acura; and (5) that AHM and Orr failed to perform the repair work in a "good and workmanlike manner." Record Document 3, ¶s 23–27. Plaintiffs claim that this conduct by AHM constitutes a breach of the implied warranty against redhibitory defects under Louisiana law and entitles them to a rescission of the sale, return of the purchase price, all collateral costs of the sale, finance charges, insurance premiums, out of pocket expenses, and legal fees, costs, and expenses incurred in connection with this litigation. *Id.* at ¶s 27–28. AHM counters that Plaintiffs' evidence is insufficient to show that the Acura contains redhibitory defects. Record Document 17-2, p. 9.

        i.      *"No-start"/battery issues*

AHM argues that the Acura's battery malfunctioned multiple times because Dr. Veluvolu failed to understand and follow the directions for battery care set out in the owner's manual. The Acura is a "hybrid electric supercar" that comes with both a standard 12-volt battery that powers

the airbags, interior and exterior lights, and other standard 12-volt systems, and a High Voltage battery that powers the propulsion motors and recharges the 12-volt battery. *Id.* at 9–10. The owner's manual states that the 12-volt battery condition should be checked monthly. *Id.* at 10; Record Document 17-4, p. 22. AHM contrasts this with Dr. Veluvolu's deposition, wherein he stated that he never performed any maintenance on the 12-volt battery. Record Document 17-2, p. 11.

AHM points out that the owner's manual states that the 12-volt battery should be attached to an accessory battery charger during periods of non-use to maintain its charge. *Id.*; Record Document 17-4, p. 23. AHM contrasts those instructions with Dr. Veluvolu's stated belief that the Acura's batteries should be able to sit for three months and still maintain a charge. Record Document 17-2, p. 10. AHM argues that the "no start" incidents in June and August of 2017 occurred because Dr. Veluvolu left the Acura unused for several weeks without the use of an accessory battery charger. *Id.* at 12.[6]

Plaintiffs challenge AHM's assertion that their failure to properly maintain the 12-volt battery caused the Acura's "no start" issues. Plaintiffs submit the deposition of James Jongkind ("Jongkind"), an employee of AHM's legal department who inspects and investigates Honda products that are the subject of claims or litigation. Record Document 21-2, p. 3. Jongkind admitted that the reason the owner's manual recommends a monthly inspection of the 12-volt battery is to check for corrosion. Record Document 21, p. 17. Jongkind did not find any corrosion on the batteries during his inspection of the Acura. *Id.* at 17–18; Record Document 21-2, p. 7.

---

[6] AHM appears to attribute the February 2017 "no start" incident to Plaintiffs storing the Acura's key too close to the vehicle based on an Orr technician's advice to store the keys farther away in case the car senses the key fob and runs the power. Record Document 17-2, p. 12. AHM notes that Jennifer Veluvolu testified that after the February incident, Plaintiffs began storing the Acura's keys in the master bedroom closet, farther away from the vehicle. *Id.* at n.22.

Furthermore, Plaintiffs point out that the owner's manual recommends that the 12-volt battery be attached to an accessory battery charger during periods of non-use longer than one month. Record Documents 21, p. 19; 17-4, p. 23. Dr. Veluvolu claims that he never left the Acura unused for longer than a month and estimates that he let it sit idle for two or three weeks at most. Record Document 21, p. 14. Plaintiffs argue that this evidence shows that the Acura's "no start"/battery issues cannot be attributed to Dr. Veluvolu's failure to properly maintain the 12-volt battery in accordance with the owner's manual. *Id.* at 20.

> ii.   *Other issues*

Plaintiffs acknowledge that the Acura has not experienced any "no start" incidents since the car was returned to them on September 21, 2017, but contend that the car is still experiencing problems. Record Documents 17-6, p. 28; 21, p. 13. In their opposition, Plaintiffs claim that the "parasitic draw" that previously drained the 12-volt battery no longer exists, but a variation of it still exists and causes the door handles not to deploy automatically as they were designed to do when someone approaches with the car key in hand. Record Document 21, p. 13. Plaintiffs allege that the failure of the door handles to deploy automatically is connected to the Acura's battery/"no start" issues because the previous instances in which the Acura failed to start were preceded by the door handles failing to deploy. *Id.* Plaintiffs also state that a rattle still exists in both doors and that the "infotainment" screen in the car was not working immediately before Jongkind's inspection. *Id.*

AHM acknowledges that Jongkind heard a "faint rattle noise" when he test-drove the Acura on rough surfaces at speeds below twenty-five miles per hour. Record Document 17-2, p. 12 n.24. AHM claims that even if this rattle exists, Plaintiffs have provided no evidence that it is a redhibitory defect that existed at the time of the Acura's manufacture. *Id.* at 12–13. AHM also

asserts that Jongkind's inspection showed that the automatic door handles deployed normally and that the "infotainment" screen operated normally. *Id.* at 13. Finally, AHM argues that Plaintiffs' redhibition claim fails as a matter of law because they present no expert testimony and are entitled to no legal presumption that these issues are attributable to redhibitory defects. *Id.* at 13–14.

iii.     *Analysis*

After reviewing the evidence presented by both parties, the Court finds that a genuine issue of material fact exists as to whether the Acura's failure to start on four separate occasions represents a redhibitory defect that was present at the time of sale. Factual questions also exist regarding whether the Acura's "no start" issues have been fully repaired and, if so, whether the vehicle can still be said to contain a redhibitory defect.

Plaintiffs purchased a new and expensive "hybrid electric supercar" car that failed to start four separate times in less than a year after being driven only 1,568 miles. *See* Record Document 17-6, p. 26. The Court finds that these "no start" incidents could render the use of the Acura "so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." La. Civ. Code Ann. art. 2520. The evidence cited by Plaintiffs in their opposition raises factual questions as to whether the alleged defect existed at the time of the sale. Although the battery issues did not manifest until three months after the sale, a reasonable inference may be made that the alleged defect existed at the time of sale based on the age of the car. *See Sweeny*, 574 F.2d at 1300. Plaintiffs had owned the car for almost four months and driven it 250 miles when the issues first arose in February of 2017. Record Document 17-6, p. 23.

As stated previously, Plaintiffs are required to prove the existence of a redhibitory defect by a preponderance of the evidence. *Morris*, 756 So. 2d at 561. Furthermore, this evidence may be circumstantial as long as it excludes other reasonable hypotheses with a "fair amount of certainty."

*Custom Metal*, 346 So. 2d at 1380. Buyers are not required to negate all possible causes in order to succeed. *Id.* In its reply brief, AHM argues that Plaintiffs' evidence fails to exclude the hypothesis that "remote storage and/or non-use drained the car's battery." Record Document 24, p. 5. However, Plaintiffs have offered evidence, namely Jongkind's deposition, the owner's manual, and Dr. Veluvolu's deposition, that contradicts that hypothesis by showing that Dr. Veluvolu did not leave the Acura unused without using an accessory battery charger for longer than the owner's manual advised. *See* Record Document 21, pp. 10–11. Furthermore, AHM itself cites Jennifer Veluvolu's testimony that after the "no start" incident in February of 2017, Plaintiffs began storing the key remote farther away from the car. *See* Record Document 17-2, p. 12 n.22.

A question of fact also exists as to whether the Acura's "no start"/battery issues have been repaired. It is uncontested that the Acura has not failed to start since August of 2017. Record Documents 17-6, p. 28; 21, p. 13. After his inspection in December of 2018, Jongkind concluded that the Acura was free of any defects "in material or factory workmanship," fit for its ordinary purpose, and a safe and reliable means of transportation. Record Document 17-4, pp. 27–28. This may indicate that the first two batteries installed in the Acura were faulty, and the "no start" issues were fully repaired when Orr replaced the battery for the second time. However, Jongkind also testified that he could not say whether or not the batteries were defective. Record Document 21-2, p. 11. Additionally, Jongkind stated that this is the only case he has investigated for Honda involving an Acura NSX whose 12-volt battery did not charge properly. *Id.* at 10–11. Pierce, Orr's Service Advisor, testified that he believes the Acura's defects were caused by two bad batteries in a row and have been repaired. Record Document 21-3, p. 39–40. He also stated that although he has seen it happen before, it is not normal for batteries to need replacing that frequently and he did not know what caused the batteries to require replacement. *Id.* at 37. These contrasting pieces of

evidence as to what might have caused the alleged defects and whether they have been fully repaired indicate a genuine issue of material fact that should be decided at trial.

Lastly, issues of fact exist as to whether the problems Plaintiffs claim to still experience with the Acura, such as the rattle and the door handles failing to deploy, constitute redhibitory defects. A redhibitory action can be based on multiple defects, even when many of the defects are minor or have been repaired. *Young v. Ford Motor Co., Inc.*, 595 So. 2d 1123, 1126 (La. 1992). In a case involving a new car with several defects, the Louisiana First Circuit Court of Appeals stated:

> [Defendant] has argued that the defects prior to the accident which were repaired cannot form the basis for a redhibitory action. We find that the frequency of the pattern of repairs coupled with the brake failure when considered together show that the Corvette failed to perform properly in the manner it was intended to perform under the conditions of normal use. We find the record provides sufficient evidence to support the presumption that had [Plaintiff] known that the vehicle he purchased was going to have to be repaired because of defects so frequently that he had the use of the car for less than one-half of the time he owned it, he would not have purchased the car.

*Cangelosi v. McInnis Peterson Chevrolet, Inc.*, 373 So. 2d 1346, 1350 (La. App. 1 Cir. 1979). Similarly, the defects alleged by Plaintiffs raise doubts as to whether the Acura performed in the manner it was intended to perform under conditions of normal use. The Court finds that a factual question exists as to whether Dr. Veluvolu would have purchased the Acura had he known that it would need two replacement batteries in its first year and that it would experience other comparatively minor defects such as persistent rattling, even if the "no start"/battery issues have already been successfully repaired.

### 2. Rescission of the sale or reduction of the purchase price

AHM claims that even if the Acura is found to contain a redhibitory defect, Plaintiffs are only entitled to a reduction of the purchase price instead of rescission of the sale. Record Document 17-2, p. 14. Louisiana Civil Code article 2520 provides that a defect can still be redhibitory even

when it merely diminishes the usefulness or value of a thing so that it must be presumed that a buyer would still have bought it but for a lesser price. La. Civ. Code Ann. art. 2520. In such a case, the proper remedy is a reduction of the purchase price rather than a rescission of the sale. *Id.* A rescission of the sale is warranted only when a defect renders the thing useless or so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. *Id.* AHM argues that because the "no start" issues alleged in the complaint are no longer present and because the door rattle Plaintiffs allege did not manifest until six months after the sale, any defects contained in the Acura cannot warrant a rescission of the sale. Record Document 17-2, p. 16. According to AHM, it is entitled to a judgment dismissing Plaintiffs' claim to a rescission of the sale and limiting any recovery to a reduction of the purchase price. *Id.*

Plaintiffs argue that rescission of the sale versus reduction of the purchase price is a question of material fact that should be left to a fact finder. Record Document 21, p. 25. They also cite Dr. Veluvolu's testimony that he would not have purchased the Acura at any price if he had known of its defects. *Id.* AHM responds that the proper determination for the rescission of the sale is what a reasonable man would have done under like circumstances, not what Dr. Veluvolu would have done. Record Document 24, p. 10. AHM appears to admit that this is an issue of fact but argues that no reasonable jury could find that Plaintiffs are entitled to rescission of the sale as a matter of law. *Id.*

A district court has discretion to limit the remedy of a buyer to a reduction of the purchase price. La. Civ. Code Ann. art. 2541. However, a reduction in purchase price is the appropriate remedy only when a vehicle is able to be restored to its original use. *Alston v. Fleetwood Motor Homes of Ind. Inc.*, 480 F.3d 695, 701 (5th Cir. 2007). As stated above, whether the Acura contained a redhibitory defect at the time of sale and whether any defect has been fully repaired

are questions of fact that cannot be resolved on a motion for summary judgment. Therefore, the Court will not limit Plaintiffs' potential recovery to a reduction of the purchase price at this stage of the litigation.

   3.   Nonpecuniary damages

Plaintiffs seek general damages pursuant to Louisiana Civil Code Article 1998, including damages for "mental anguish, humiliation, and inconvenience." Record Document 3, p. 3. AHM argues that, even in the event that Plaintiffs succeed in their redhibition claim, they are not entitled to such nonpecuniary damages because the purchase of the Acura was not intended to gratify a nonpecuniary interest. Record Document 17-2, pp. 17–18. Plaintiffs respond that whether the object of a contract is to gratify a nonpecuniary interest is a question of fact. Record Document 21, p. 26.

Article 1998 allows for the recovery of damages for a nonpecuniary loss when the contract in question, by its nature, was intended to gratify a nonpecuniary interest and when the obligor knew or should have known that his failure to perform would cause a nonpecuniary loss. La. Civ. Code Ann. art 1998. The Louisiana Supreme Court has held that the purchaser of a vehicle containing a redhibitory defect can recover damages for mental anguish and emotional distress only if the requirements for the recovery of nonpecuniary damages as stated in Article 1998 are met. *Young*, 595 So. 2d at 1133. The Court stated that the nature of a contract for the sale of a new car from a dealership is primarily pecuniary in most cases. *Id.* However, the Court hypothesized that the purchase of an antique car or a specially-designed, custom built vehicle might constitute a significant nonpecuniary interest "relating to enjoyment, taste, and personal preference of owning and driving the chosen vehicle" and the owner's desire to "own, and perhaps to show, a distinctive, unique automobile." *Id.*

Based on the evidence presented, the Court finds that a question fact exists as to whether the sale of the Acura was intended to gratify a nonpecuniary interest for Dr. Veluvolu. Plaintiffs paid a total of $237,199.80 for the vehicle, including finance charges and expenses surrounding the sale. Record Document 3, ¶ 8. The Acura is a high-end vehicle, which AHM describes as a "hybrid electric supercar." *See* Record Document 17-2, p. 9. Dr. Veluvolu owns several high-end vehicles, most of which, including the Acura, were bought "for his pleasure." Record Document 21, p. 12. Dr. Veluvolu stated in his deposition that he has loved cars since he was a child, that he has "always loved the NSX," and that he remembers the NSX as "a revolutionary car when it was first produced" during his childhood. Record Document 17-6, p. 5. Plaintiff put a deposit down on the car as soon as he heard the NSX was coming back after being discontinued. *Id.* All of these facts indicate that Dr. Veluvolu's purchase of the Acura was more like buying a custom-built or antique car than buying a standard new car from a dealership. *See Young*, 595 So. 2d at 1133. Moreover, as Plaintiff points out, whether the principal object of a contract is to gratify a nonpecuniary interest is a question of fact. *Jones v. Winnebago Indus., Inc.*, 47,137 (La. App. 2 Cir. 5/16/02) 92 So. 3d 1113, 1121.

A question of fact also exists as to whether AHM knew that nonpecuniary loss would result if it failed to deliver the Acura free of redhibitory defects. *See* La. Civ. Code Ann. art 1998. Dr. Veluvolu paid a $1,000 deposit for the Acura in either 2011 or 2010, several years before it was delivered in 2016. Record Document 17-6, p. 4. He went to pick up the car with his entire family. *Id.* In Jennifer Velovolu's deposition, she stated that the dealership had a reception for the family and placed a "big red bow" on the car when they picked it up. Record Document 17-7, p. 3. These facts are indicative of more than a pecuniary interest in the vehicle and create a question of fact as

to what AHM knew about Dr. Veluvolu's nonpecuniary interest in the car. Therefore, the Court denies summary judgment as to Dr. Veluvolu's claim for nonpecuniary damages.

As to Jennifer Veluvolu, there is much less evidence that the Acura was intended to gratify a nonpecuniary interest on her part. In its motion, AHM point to portions of her deposition where she stated that she is not a car person, that she was not as excited about the Acura as her husband was, and that she was not interested in driving it. Record Document 17-2, p. 17. AHM argues that she seeks to recover nonpecuniary damages for "bystander recovery" based on witnessing Dr. Veluvolu's disappointment. *Id.* Notably, Plaintiffs' opposition does not attempt to rebut AHM's arguments as to why Jennifer Veluvolu's nonpecuniary damages claim should be dismissed. Record Document 21, p. 26. The Court finds that AHM has satisfied its initial burden of showing that there is no genuine dispute of material fact as to this issue, and Plaintiffs have failed to demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings" and "designat[ing] specific facts" for support. *Little*, 37 F.3d at 1075. Therefore, summary judgment is **GRANTED** as to Jennifer Veluvolu's claim for nonpecuniary damages pursuant to Article 1998.

### B. Magnuson-Moss Warranty Act

Plaintiffs claim that AHM violated the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–2312, by failing to tender the Acura free of defects and refusing to repair or replace the defective Acura and thereby breaching the written and implied warranties of the sale. Record Document 3, ¶s 29–37. AHM asserts that it is entitled to a dismissal of Plaintiffs' MMWA claim for the same reasons it is entitled to a dismissal of their redhibition claim. Record Document 17-2, p. 18. AHM argues that Plaintiffs' substantive claims under the MMWA are the same as their claims under state law and because their rehibition claim should be dismissed, their claims under the MMWA should also be dismissed. *Id.* AHM provided no substantive argument as to why

Plaintiffs' MMWA claim should be dismissed. As stated above, Plaintiffs' redhibition claims under state law will not be dismissed. Summary judgment is similarly denied as to the MMWA claims.

## C. Negligent Repair

Finally, Plaintiffs allege that AHM is liable to them for breaching its "high duty" as a manufacturer to make repairs on the Acura "in a good and workmanlike manner within a reasonable time." Record Document 3, ¶ 40. According to Plaintiffs, AHM's attempted repairs were done so "negligently, carelessly, and recklessly as to substantially impair the Acura's use, value, and safety." *Id.* at ¶ 41. Plaintiffs claim that AHM's negligent failure to repair the Acura caused them to be without the car for weeks at a time and required them to bring the car in for multiple repairs, which caused them great inconvenience. *Id.* at ¶ 42.

According to AHM, Plaintiffs' negligent repair claim fails for two reasons. First, AHM argues that the Louisiana Products Liability Act ("LPLA") excludes a negligent repair claim against a manufacturer. Record Document 17-2, pp. 19–20. Second, AHM alleges that Plaintiffs do not present enough evidence to sustain a negligent repair claim even if such a claim were viable as a matter of law. *Id.* AHM points out that Plaintiffs seek to hold it liable for repairs performed by Orr. *Id.* Nowhere in the complaint do Plaintiffs allege that AHM performed any repair work on the Acura.

AHM cites to Fifth Circuit case law in which the court stated that a plaintiff's negligent repair claim against a car's manufacturer, predicated on negligence on the part of a car dealership, required the plaintiff to show that the dealership was an agent of the manufacturer. *Riley v. Ford Motor Co.* 442 F.2d 670, 672 (5th Cir. 1971). AHM asserts that in Louisiana the party who seeks to prove that an agency relationship exists has the burden of proof and because Plaintiffs have not

alleged or proven an agency relationship between Orr and AHM, their negligent repair claim

should not survive summary judgment. Record Document 17-2, p. 20 (quoting *Bank of Greensburg*

*v. Forrest*, 520 So. 2d 728,732 (La. 1988)).

In their opposition,[7] Plaintiffs respond that the repeated repairs performed on the Acura

constituted "a breach of contract of repair by AHM in failing to make sure Orr Acura promptly

and completely did the repairs, and that . . . AHM is liable for general damages for negligent

repair, which are allowed under general breach of contract law." Record Document 21, p. 28. In

support of this contention, Plaintiffs cite two cases in which the entity that performed repairs on

the car was a named defendant in the case. Those cases are not wholly applicable to the case at

hand in which the entity that performed the repair work is not a defendant. *Id.* Plaintiffs also cite

case law indicating that a negligent repair claim is permissible against a manufacturer under

Louisiana law. *Id.* Plaintiffs do not respond to AHM's argument that they are required to prove

that an agency relationship existed between Orr and AHM in order to hold AHM liable for Orr's

allegedly negligent repairs. Other than the frequency of the repairs, Plaintiffs do not cite any

evidence that the repairs undertaken by Orr were negligent. Plaintiffs also fail to cite any evidence

showing that these allegedly negligent repairs caused them damage beyond the damages they

allege pursuant to their redhibition claim. The opposition makes vague references to

"inconvenience, loss of use, aggravation, delay, and mental anguish," but no facts are provided in

support of these claims specifically. *See id.* at 27–28.

---

[7] In this section of their opposition, Plaintiffs allege for the first time that because AHM is the
Acura's manufacturer, it is presumed to know of the defect in the Acura and should be treated as
a seller in bad faith under Louisiana's redhibition laws. Record Document 21, p. 27.

The Court is inclined to dismiss Plaintiffs' negligent repair claim based on a lack of factual support and evidence, combined with Plaintiff's failure to demonstrate why AHM should be held liable for allegedly negligent repairs performed by Orr. However, the Court will permit the parties to submit additional briefing on this issue.

**IT IS ORDERED** that Plaintiffs will have until **Thursday, June 13, 2019**, to submit a brief, no longer than ten pages, outlining (1) on what legal basis they seek to hold AHM liable for repairs made by Orr, (2) what evidence supports their claim that the repairs were performed so "negligently, carelessly, and recklessly as to substantially impair the Acura's use, value, and safety," and (3) what evidence establishes their damages for negligent repair as separate from the damages they seek pursuant to their redhibition claim.

**IT IS FURTHER ORDERED** that AHM will have **seven days** from when Plaintiffs' brief is submitted to file a reply. In this reply, AHM should clarify whether it still denies being the manufacturer of the Acura. *See* Record Document 6, ¶ 2.

## IV.  CONCLUSION

For the foregoing reasons, AHM's Motion for Summary Judgment [Record Document 17] is hereby **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs are ordered to submit additional briefing regarding their negligent repair claim by **Thursday, June 13, 2019**. Summary judgment is **GRANTED** as to Jennifer Veluvolu's claim for nonpecuniary damages pursuant to Louisiana Civil Code article 1998 and this claim is **DISMISSED WITH PREJUDICE**. Summary judgment is **DENIED** as to all other claims.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this ___31st___ day of May, 2019.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE